# EXHIBIT A

Case 2:20-cr-00578-JMV Document 1 Filed 07/15/20 Page 2 of 29 PageID: 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 20-578 (JMV) |
| | | |
| v. | : | 18 U.S.C. § 1349 |
| | | 18 U.S.C. § 1347 |
| | : | 18 U.S.C. § 371 |
| JEFFREY ANDREWS, | | 18 U.S.C. § 2 |
| CHAD BEENE, | : | 42 U.S.C. § 1320a-7b(b)(2)(B) |
| ADAM BROSIUS, and | | |
| ROBERT SCHNEIDERMAN | : | |

# **I N D I C T M E N T**

The Grand Jury in and for the District of New Jersey, sitting in Newark,

charges:

## **COUNT 1**

### **(Conspiracy to Commit Health Care Fraud)**

1.      At times relevant to this Indictment, unless otherwise indicated:

#### The Defendants and Others

a.      Defendant JEFFREY ANDREWS was a resident of Bryn Mawr,

Pennsylvania.  ANDREWS was the Chief Financial Officer for both Main Avenue

Pharmacy, Inc. ("Main Avenue Pharmacy") and Parent Company-1.

b.      Defendant CHAD BEENE was a resident of Philadelphia,

Pennsylvania.  BEENE was the National Sales Manager for Parent Company-1.

1

Exhibit A

c.     Defendant ADAM BROSIUS was a resident of Langhorne, Pennsylvania.  BROSIUS was the director of business development for Main Avenue Pharmacy until on or about June 30, 2015, when he became the interim President of both Main Avenue Pharmacy and Parent Company-1.  BROSIUS became the President of Main Avenue Pharmacy on or about November 13, 2015.  BROSIUS was also the owner and President of Pharma Sales Group, Inc. ("Pharma Sales").

d.     Defendant ROBERT SCHNEIDERMAN was a resident of Langhorne, Pennsylvania.  SCHNEIDERMAN was the President of Main Avenue Pharmacy and was the founding partner, Chief Executive Officer, and President of Parent Company-1 until on or about June 30, 2015.

e.     Main Avenue Pharmacy was a mail-order pharmacy located in Clifton, New Jersey that primarily dispensed compounded medications.  Main Avenue Pharmacy was acquired by Parent Company-1 in 2014 and was its wholly owned subsidiary.

f.     Parent Company-1 was a publicly traded company incorporated in Delaware with its principal place of business in Clifton, New Jersey.  Parent Company-1's revenue was almost exclusively generated by Main Avenue Pharmacy from in or about 2014 through in or about 2016.  The board of directors and officers of Parent Company-1 were directly involved in and responsible for the activities of Main Avenue Pharmacy, which did not have its own board of directors.

Exhibit A

g.     Pharma Sales was a Pennsylvania corporation with its principal place of business in Langhorne, Pennsylvania. BROSIUS owned and operated Pharma Sales.

h.     "Beneficiaries" were individuals covered under health care benefit programs, as defined under 18 U.S.C. § 24(b), including TRICARE, Medicare, and commercial insurance companies, and their associated pharmacy benefit managers, which provided prescription benefits that covered compounded medications.

i.     "Marketing Company-1" was a co-conspirator company located in Lighthouse Point, Florida.

j.     "Marketing Company-2" was a co-conspirator company located in Scottsdale, Arizona.

k.     "Marketing Company-3" was a co-conspirator company located in Coral Springs, Florida.

l.     "Marketing Company-4" was a co-conspirator company located in Plantation, Florida (collectively, Marketing Companies 1, 2, 3, and 4, and other marketing companies, are referred to as the "Marketing Companies.")

m.     The Marketing Companies maintained direct relationships with compounding pharmacies, like Main Avenue Pharmacy, and with other Marketing Companies, like Pharma Sales. Through these relationships, as described below, the Marketing Companies agreed to direct prescriptions for compounded medications for

3

Beneficiaries to Main Avenue Pharmacy. In return, Main Avenue Pharmacy, either directly or indirectly through Pharma Sales, paid the Marketing Companies a percentage of the reimbursement amount that Main Avenue Pharmacy received from health care benefit programs.

n. "Telemedicine Companies" were companies around the country that purportedly provided telemedicine services to individuals by hiring health care providers. Generally speaking, telemedicine allowed health care providers, such as doctors, to evaluate, diagnose, and treat patients remotely—without the need for an in-person visit—by using telecommunications technology, such as the internet or telephone to interact with a patient. Before in or about June 2017, the practice of telemedicine was illegal in New Jersey.

o. "Commercial Payer-1" was a private health care benefit program located in New Jersey.

p. "Commercial Payer-2" was a private health care benefit program located in New Jersey.

Exhibit A

<u>Compounding</u>

q.      In general, "compounding" was a practice in which a licensed pharmacist or physician, combined, mixed, or altered ingredients of a drug to create a medication tailored, at least purportedly, to the needs of an individual patient.

r.      Compounded drugs were not approved by the Food and Drug Administration ("FDA") because the FDA did not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs.

s.      Generally, compounded drugs could be prescribed by a physician when an FDA-approved drug did not meet the health needs of a particular patient. For example, if a patient was allergic to a specific ingredient in an FDA-approved medication, such as a dye or preservative, a compounded drug could be prepared excluding the substance that triggered the allergic reaction. Compounded drugs could also be prescribed when a patient could not consume a medication by traditional means, such as an elderly patient or child who could not swallow an FDA-approved pill and needed the drug in a liquid form that was not otherwise available.

t.      Pharmacies engaged in the practice of compounding were referred to as "compounding pharmacies."

Exhibit A

## TRICARE

u.     TRICARE was a health care benefit program of the United States Department of Defense ("DoD") Military Health System that provided health insurance coverage for active duty military service members, National Guard and Reserve members, retirees, their families, and survivors. Individuals who received health care benefits through TRICARE were referred to as TRICARE Beneficiaries.

v.     TRICARE and its pharmacy benefits manager were "health care benefit programs" that affected commerce as defined in 18 U.S.C. § 24(b) and were "federal health care programs" as defined in 42 U.S.C. § 1320a-7b(f).

## Medicare

w.     Medicare was a federal program to assist qualified elderly, blind, and disabled individuals in paying for the cost of health care.

x.     Medicare and its pharmacy benefits manager were "health care benefit programs" that affected commerce as defined in 18 U.S.C. § 24(b) and were "federal health care programs" as defined in 42 U.S.C. § 1320a-7b(f).

y.     The Center for Medicare and Medicaid Services ("CMS") was the federal agency responsible for the administration of the Medicare program.  CMS contracted with private insurance companies to process and pay individual Medicare claims.  Claims for Medicare and other insurance plans were submitted for processing

Exhibit A

and payment through the mail and/or electronically by utilizing facilities in interstate commerce.

## The Conspiracy

2.     From in or about March 2014 through in or about June 2016, in Passaic County, in the District of New Jersey, and elsewhere, defendants

**JEFFREY ANDREWS,
CHAD BEENE,
ADAM BROSIUS, and
ROBERT SCHNEIDERMAN**

did knowingly and intentionally conspire and agree with each other and others to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, or under the custody and control of, a health care benefit program in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

## Goal of the Conspiracy

3.     The goal of the conspiracy was for ANDREWS, BEENE, BROSIUS, and SCHNEIDERMAN (collectively, the "Defendants") to obtain money from health care benefit programs, including private insurance companies, TRICARE, and Medicare, by submitting and causing the submission of insurance claims for medically unnecessary—but exorbitantly priced—compounded medications.

7

Exhibit A

## Manner and Means of the Conspiracy

4. To carry out the conspiracy and to effect its unlawful object, the Defendants, and others, engaged in a variety of means and methods including, among others, those described below.

5. In or about 2014, the Defendants understood that health care benefit programs would pay far more money (via reimbursements) to supply a patient with certain prescription compounded medications, including, for example, compounded vitamins, pain creams, scar creams, and migraine medication, than those plans would pay for the non-compounded equivalent of those medications.

6. To take advantage of these lucrative reimbursements, the Defendants set out to generate more prescriptions—and thus higher reimbursements—for compounded medications from Beneficiaries with prescription benefits that paid for them.

7. Specifically, beginning in or about 2014, ANDREWS, BROSIUS, and SCHNEIDERMAN caused Main Avenue Pharmacy to enter into an agreement with Pharma Sales, which was controlled by BROSIUS. Pursuant to that agreement, Main Avenue Pharmacy paid commissions to Pharma Sales based on the total money in reimbursements that Main Avenue Pharmacy received from health care benefit programs for prescription compounded medications.

8

8.    BROSIUS, in turn, through Pharma Sales, entered into agreements with Marketing Companies 1, 2, and 3, among others.  Those agreements called for Pharma Sales to pay commissions based on the volume of prescriptions that Marketing Companies 1, 2, and 3 sent to Main Avenue Pharmacy and that resulted in Main Avenue Pharmacy receiving reimbursements from health care benefit programs. The more prescriptions Marketing Companies 1, 2, and 3 sent to Main Avenue Pharmacy, the higher the payments to them (transmitted from Main Avenue Pharmacy via Pharma Sales). Consequently, the Marketing Companies targeted Beneficiaries of TRICARE, Medicare, and commercial insurance companies to generate compounded medication prescriptions, regardless of medical necessity.

9.    To ensure that the claims for compounded medications yielded lucrative reimbursements, the Defendants, and others, with no medical training or licenses, created or directed others to create prescription pads, which contained specific compounded medications for a physician to choose from.  The prescription pads almost exclusively contained compounded medications like pain creams, scar creams, and vitamins, among other things, because those medications reliably generated high reimbursements.

10.    To establish the lucrative ingredient formulas for the compounded medications that would be placed on Main Avenue Pharmacy prescription pads, BEENE and BROSIUS submitted and directed employees of Main Avenue Pharmacy

9

Exhibit A

to submit false claims to health care benefit programs through a practice known as "test billing." The purpose of "test billing" was to determine how much a health care benefit program would reimburse for a particular formula for a compounded medication. This way, Main Avenue Pharmacy could include on its prescription pads formulas for compounded medications that would result in high reimbursements from TRICARE, Medicare, and commercial insurance companies. SCHNEIDERMAN knew about and approved of this practice.

11.     As a result of "test billing" and other methods, BEENE and BROSIUS caused Main Avenue Pharmacy's prescription pads to contain precise ingredient formulas for each compounded medication. BEENE and BROSIUS based these formulas solely on what would yield the most expensive reimbursements, and not on the medical or health needs of any particular patient.

12.     BEENE and BROSIUS designed Main Avenue Pharmacy's prescription pads to be both easy to use and to prescribe expensive compounded medications. For example, the pads contained check boxes next to each compounded medication to increase the likelihood that the physician would not change the formula, which could lower the reimbursement amount and cause Main Avenue Pharmacy to receive less money from the scheme. The prescription pads also allowed the doctor to select, in some cases, over 10 refills without an additional prescription. Finally, the pads typically had a check box that allowed the physician to authorize Main Avenue

Pharmacy to substitute or change the prescribed medication to an alternate formula covered by the Beneficiary's insurance. If the physician checked this box, Main Avenue Pharmacy could alter the formula prescribed by the physician to ensure that the Beneficiary's insurance would cover the prescription at a high rate, regardless of whether the altered formula was consistent with the Beneficiary's medical needs.

13.     After a prescription pad was finalized, BEENE and BROSIUS disseminated them or directed them to be disseminated to the co-conspirator Marketing Companies, either directly or through BROSIUS at Pharma Sales. The Marketing Companies, in turn, identified and referred Beneficiaries and the prescription pads to the Telemedicine Companies and the physicians with whom the Marketing Companies had financial agreements. The physicians often filled out and signed the prescriptions without having examined, seen, or even spoken to the Beneficiary. Typically, because they were paid by the Marketing Companies to authorize prescriptions, neither the Telemedicine Companies nor their physicians billed the Beneficiaries' health-care benefit programs for their services.

14.     Once a physician signed a prescription for a Beneficiary, typically using Main Avenue Pharmacy's prescription pad and often including prescriptions for multiple medications, the prescription was sent back to the referring Marketing Company. The Marketing Company then transmitted the completed prescription to a dedicated e-fax number assigned to each Marketing Company at Main Avenue

11

Pharmacy. BROSIUS and others at Main Avenue Pharmacy created a dedicated e-fax number for each Marketing Company to allow Main Avenue Pharmacy to receive the prescriptions quickly and to track the prescriptions for each Marketing Company. This allowed the Defendants to calculate how much Main Avenue Pharmacy would pay in commissions to Pharma Sales, and, in turn, how much Pharma Sales would pay in commissions to the Marketing Companies based on the volume of referrals and reimbursement amounts.

15.    The Defendants understood that health care benefit programs would frequently stop reimbursing for certain ingredient formulas in compounded medications because of fraud, waste, or abuse. To get around these impediments to their scheme and continue the fraud, the Defendants solicited and accepted suggested ingredient formulas from co-conspirator Marketing Companies. The Defendants directed Main Avenue Pharmacy employees to update the prescription pads with new compounded medication formulas received from the Marketing Companies.

16.    BROSIUS instructed employees of Main Avenue Pharmacy to confirm that Beneficiaries who had already received a compounded medication from Main Avenue Pharmacy would receive refills of the same compounded medication. BROSIUS directed this practice to ensure that Main Avenue Pharmacy, and thus the Defendants, could continue to reap illicit profits without having to collect an additional prescription from a physician.

Exhibit A

17.     Beneficiaries at times complained to Main Avenue Pharmacy that they did not request or want the compounded prescription medications that they had received.  The Beneficiaries also repeatedly told employees of Main Avenue Pharmacy that they had not seen, spoken to, or ever heard of the doctor who had prescribed the compounded medication.  ANDREWS, BROSIUS, and SCHNEIDERMAN were advised of these complaints.  To protect the profits from the scheme, ANDREWS and BROSIUS ordered Main Avenue Pharmacy employees to try to convince the complaining Beneficiaries to keep the expensive compounded medications anyway since they would lose money if the medications were returned and Main Avenue Pharmacy had to return reimbursements to the health care benefit programs.

18.     In addition, at times, BROSIUS directed Main Avenue Pharmacy employees to waive the Beneficiaries' required co-payments for the compounded medications.  BROSIUS gave this direction to ensure that the Beneficiaries kept the compounded medications, did not return them, and continued to be eligible to receive refills.  ANDREWS and SCHNEIDERMAN knew of and approved BROSIUS's direction to waive co-payments for this purpose.  To disguise this practice from the health care benefit programs, BROSIUS at times instructed Main Avenue Pharmacy employees to obtain money orders and enter the Beneficiaries as the payer and Main Avenue Pharmacy as the payee to give the false appearance that the Beneficiaries had paid the co-payments when they had not.

**Exhibit A**

19.     In total, the Defendants, and others at Main Avenue Pharmacy, submitted claims to health care benefit programs for compounded medications that exceeded $35,000,000.  The defendants all shared in the proceeds received from these claims.

In violation of Title 18, United States Code, Section 1349.

Exhibit A

Case 2:20-cr-00578-JMV Document 1 Filed 07/16/20 Page 15 of 28 PageID: 15

## COUNTS 2 - 7

### (Health Care Fraud)

1.  Paragraphs 1 and 3-19 of Count 1 of this Indictment are realleged here.

2.  On or about the dates listed below, in Passaic County, in the District of New Jersey, and elsewhere, the defendants specified per count below knowingly and willfully executed a scheme and artifice to defraud a health care benefit program and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, or under the custody and control of, a health care benefit program in connection with the delivery of and payment for health care benefits, items, and services:

Exhibit A

| Count | Defendant(s) | Approx. Date | Execution |
|---|---|---|---|
| 2 | **BEENE and SCHNEIDERMAN** | 5/1/2015 | BEENE and SCHNEIDERMAN caused Main Avenue Pharmacy to submit a claim to Medicare for a prescription compounded medication for Individual-1. |
| 3 | **BEENE and SCHNEIDERMAN** | 5/18/2015 | BEENE and SCHNEIDERMAN caused Main Avenue Pharmacy to submit a claim to Commercial Payer-1 for a prescription compounded medication for Individual-2. |
| 4 | **ANDREWS, BEENE, and BROSIUS** | 8/20/2015 | ANDREWS, BEENE, and BROSIUS caused Main Avenue Pharmacy to submit a claim to Commercial Payer-2 for a prescription compounded medication for Individual-3. |
| 5 | **ANDREWS, BEENE, and BROSIUS** | 11/18/2015 | ANDREWS, BEENE, and BROSIUS caused Main Avenue Pharmacy to submit a claim to Commercial Payer-2 for a prescription compounded medication for Individual-4. |
| 6 | **ANDREWS, BEENE, and BROSIUS** | 12/30/2015 | ANDREWS, BEENE, and BROSIUS caused Main Avenue Pharmacy to submit a claim to Medicare for a prescription compounded medication for Individual-5. |
| 7 | **ANDREWS, BEENE, and BROSIUS** | 1/27/2016 | ANDREWS, BEENE, and BROSIUS caused Main Avenue Pharmacy to submit a claim to Medicare for a prescription compounded medication for Individual-6. |

In violation of Title 18, United States Code, Section 1347, and Title 18, United States Code, Section 2.

Exhibit A

## COUNT 8

### (Conspiracy to Violate the Anti-Kickback Statute)

1.     Paragraphs 1 and 3-19 of Count 1 of this Indictment are realleged here.

2.     From in or about March 2014 through in or about June 2016, in the District of New Jersey, and elsewhere, defendants

**JEFFREY ANDREWS,**
**CHAD BEENE,**
**ADAM BROSIUS, and**
**ROBERT SCHNEIDERMAN**

did knowingly and intentionally conspire and agree with each other and others to knowingly and willfully offer and pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, to any person in order to induce such person to purchase, order, and arrange for and recommend purchasing and ordering any good, facility, service, and item, that is, prescriptions for compounded medications, for which payment was made in whole and in part under a federal health care program, that is, TRICARE and Medicare, contrary to Title 42, United States Code, Section 1320a-7b(b)(2)(B).

17

Exhibit A

### Goal of the Conspiracy

3.     The goal of the conspiracy was for the Defendants to profit by paying and causing the payment of bribes and kickbacks to the co-conspirator Marketing Companies in exchange for the Marketing Companies obtaining prescriptions for highly expensive and medically unnecessary compounded medications that were to be filled by Main Avenue Pharmacy, which then would receive lucrative reimbursements from federal health care benefit programs, including TRICARE and Medicare.

### Manner and Means of the Conspiracy

4.     To carry out the conspiracy and to effect its unlawful object, the Defendants engaged in a variety of means and methods including, among others, those described below.

5.     Through Main Avenue Pharmacy's relationship with the co-conspirator Marketing Companies, the Defendants identified Beneficiaries of federal health care benefit programs, including TRICARE and Medicare, so that they could obtain prescriptions for compounded drugs and submit claims to the federal health care benefit programs.

6.     The Defendants targeted TRICARE Beneficiaries in particular because TRICARE reliably reimbursed prescriptions for highly lucrative compounded medication prescriptions.

**Exhibit A**

7.     BEENE and BROSIUS submitted and directed employees of Main Avenue Pharmacy to submit fictitious claims for expensive compounded prescription medications to TRICARE and Medicare through a practice known as "test billing." Using this practice, Main Avenue Pharmacy tested whether TRICARE and Medicare would pay its claims for the expensive compounded medications formulations that BEENE and BROSIUS either designed themselves or approved of the design. SCHNEIDERMAN knew that the "test billing" practice was occurring and approved of it.  BEENE and BROSIUS also solicited and accepted suggested ingredient formulas from co-conspirator Marketing Companies.

8.     Main Avenue Pharmacy, at the direction of the Defendants, and others, signed a contract with Pharma Sales, which was controlled by BROSIUS, to funnel money from the scheme such that Pharma Sales would pay commissions to the Marketing Companies.  Under that contract, Main Avenue Pharmacy agreed to pay Pharma Sales a percentage of the total reimbursements that Main Avenue Pharmacy received from TRICARE and Medicare for filling the prescriptions for compounded medications.

9.     The contract further called for Pharma Sales, through BROSIUS, to in turn pay kickbacks and bribes to the co-conspirator Marketing Companies for their procuring and referring compounded medication prescriptions to Main Avenue Pharmacy.

19

Exhibit A

10. The co-conspirator Marketing Companies themselves, in turn, also paid or caused to be paid, directly and indirectly, kickbacks and bribes to the Telemedicine Companies and their physicians to induce them to procure and refer compounded medications prescriptions for TRICARE and Medicare Beneficiaries. The Marketing Companies then referred the prescriptions back to Main Avenue Pharmacy for fulfillment.

11. To calculate the value of the kickbacks and bribes that Main Avenue Pharmacy and Pharma Sales collectively paid the Marketing Companies, the Defendants tracked the number of compounded prescription referrals originating from each co-conspirator Marketing Company. The Defendants did so by creating and assigning a dedicated e-fax number at Main Avenue Pharmacy for each co-conspirator Marketing Company, to which each co-conspirator Marketing Company transmitted prescriptions. Main Avenue Pharmacy then tracked the claims to and reimbursements from federal health care benefit programs based on those referrals from the co-conspirator Marketing Companies. Based on this system of tracking referrals, claims, and reimbursements, Main Avenue Pharmacy and Pharma Sales calculated the amount of kickbacks and bribes to pay the Marketing Companies.

12. In total, Main Avenue Pharmacy, through the Defendants, received over $8 million in reimbursements from federal health care benefit programs, including TRICARE and Medicare, for compounded medications from in or about March 2014

Exhibit A

to in or about June 2016.  Main Avenue Pharmacy then disbursed a substantial percentage of those reimbursements to the co-conspirator Marketing Companies, both directly and indirectly through Pharma Sales.

### Overt Acts

13.     To advance the conspiracy and to effect its object, the Defendants committed or caused the commission of the following overt acts in the District of New Jersey and elsewhere:

  a. On or about June 4, 2014, BEENE emailed ANDREWS, BROSIUS, and SCHNEIDERMAN, forwarding information about the federal Anti-Kickback Statute and how it bars pharmacies from "knowingly or willfully giv[ing] (or offer[ing] to give) anything of value to a person or entity for referring, or arranging for the referral of a Medicare beneficiary."  BEENE added to the email: "Something to keep in mind."

  b. On or about January 27, 2015, BROSIUS emailed Marketing Company-4 and wrote that "TRICARE is easily the best at covering expensive compounds."

  c. On or about the same date, BROSIUS emailed BEENE and another individual and, in response to an online promotion for pursuing doctors with a significant number of TRICARE patients, wrote, "This is smart[.]  TRICARE is our highest payer – [Name redacted] you may want to try the same tactic – TRICARE!!!"

      d.     On or about November 30, 2015, Main Avenue Pharmacy and Pharma Sales Group executed a contract, made "retroactively effective as of July 1, 2014," to "establish a marketing relationship" between the two companies. The contract called for Main Avenue Pharmacy to pay Pharma Sales compensation that: (i) Pharma Sales would in turn pay to Marketing Companies; and (ii) Pharma Sales would keep based on a percentage of the reimbursement amount.

      e.     On or about June 4, 2015, BROSIUS sent a "contract for compounding" from his Parent Company-1 email account to the owner of Marketing Company-1. The contract called for Pharma Sales to pay Marketing Company-1 commissions ranging from 40% to 50% depending on the "total adjudications per month," meaning that Marketing Company-1 would be paid 40% to 50% of the reimbursements received by Main Avenue Pharmacy for filling prescriptions for compounded medications.

      f.     On or about June 8, 2015, BROSIUS received the executed contract from Marketing Company-1.

      g.     On or about August 20, 2015, BROSIUS sent an email to a Main Avenue Pharmacy employee and another individual with the subject line, "commission 0716 to 0731," referring to the July 16, 2015 to July 31, 2015 period. BROSIUS attached a spreadsheet to the email entitled "Commission [Marketing Company-1] 0716 to 0731." That spreadsheet detailed approximately 12 claims to

**Exhibit A**

health care benefit programs for compounded medications filed by Main Avenue Pharmacy that were referred by Marketing Company-1. The spreadsheet further detailed how Main Avenue Pharmacy received over $47,000 for filling those prescriptions and how, based on a 45% commission rate, Marketing Company-1 would be paid over $21,000 as a kickback.

h.     On or about January 20, 2016, BROSIUS sent an email to the owner of Marketing Company-1 stating, "We are depositing $522,975 into your [bank] account today. Thank you for the business." BROSIUS attached a spreadsheet to the email entitled "Dec 16-31 [Marketing Company-1]," which referred to December 16, 2015 through December 31, 2015. The spreadsheet included all the Beneficiaries for whom Marketing Company-1 had sent compounded medicine prescriptions during that period and included Medicare Beneficiaries. The spreadsheet further detailed how Main Avenue Pharmacy received over $1,000,000 and how Main Avenue Pharmacy would pay Marketing Company-1 over $522,974.78 as a kickback.

i.     From on or about August 5, 2015 to on or about March 7, 2016, Pharma Sales paid Marketing Company-1 over $4.5 million, which included kickbacks and bribes for prescription referrals for Medicare Beneficiaries.

In violation of Title 18, United States Code, Section 371.

**Exhibit A**

## COUNTS 9 - 15

### (Payment of Bribes and Kickbacks in
### Connection with a Federal Health Care Program)

1.      The allegations in Paragraphs 1 and 3-19 of Count 1 of this Indictment

are realleged here.

2.      On or about the dates set forth below as to each count, in Passaic

County, in the District of New Jersey, and elsewhere, defendants

**JEFFREY ANDREWS,
CHAD BEENE,
ADAM BROSIUS, and
ROBERT SCHNEIDERMAN**

did knowingly and willfully offer and pay any remuneration, that is, kickbacks and

bribes, directly and indirectly, overtly and covertly, in cash and in kind, to any person

to induce such person to purchase, order, and arrange for and recommend purchasing

and ordering any good, facility, service, and item for which payment may be made in

whole and in part under a federal health care program, that is TRICARE and

Medicare, as set forth below:

24

Exhibit A

| Count | Defendant(s) | Approx. Date of Kickback | Recipient | Bene-ficiary | Approx. Amt. of Kickback Paid |
|---|---|---|---|---|---|
| 9 | BEENE and SCHNEIDERMAN | 6/1/15 | Marketing Company-2 | T.Q. | $2,236.30 |
| 10 | BEENE and SCHNEIDERMAN | 6/1/15 | Marketing Company-2 | C.A. | $2,697.92 |
| 11 | ANDREWS, BEENE, and BROSIUS | 10/5/15 | Marketing Company-3 | R.W. | $404.75 |
| 12 | ANDREWS, BEENE, and BROSIUS | 11/2/15 | Marketing Company-3 | T.C. | $1,117.90 |
| 13 | ANDREWS, BEENE, and BROSIUS | 12/7/15 | Marketing Company-3 | H.M. | $1,117.90 |
| 14 | ANDREWS, BEENE, and BROSIUS | 1/20/16 | Marketing Company-1 | Y.B. | $2,418.00 |
| 15 | ANDREWS, BEENE, and BROSIUS | 1/20/16 | Marketing Company-1 | C.J. | $10,017.00 |

In violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B) and

Title 18, United States Code, Section 2.

Exhibit A

## FORFEITURE ALLEGATIONS

### Counts 1 - 15

1.      Upon conviction of the federal health care offenses (as defined in 18 U.S.C. § 24) alleged in Counts 1 to 15 of this Indictment, the defendant charged in each respective count shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), all property, real and personal, that constitutes or is derived, directly and indirectly, from gross proceeds traceable to the commission of the offenses alleged in Counts 1 through 15.

## SUBSTITUTE ASSETS PROVISION
### (Applicable to All Forfeiture Allegations)

2.      If any of the above-described forfeitable property, as a result of any act or omission of the respective defendant:

> a.  cannot be located upon the exercise of due diligence;
>
> b.  has been transferred or sold to, or deposited with, a third person;
>
> c.  has been placed beyond the jurisdiction of the Court;
>
> d.  has been substantially diminished in value; or
>
> e.  has been commingled with other property which cannot be subdivided without difficulty;

Exhibit A

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(b), to seek forfeiture of any other property of the respective defendant up to the value of the above-described forfeitable property.

A TRUE BILL

_____
FO

CRAIG CARPENITO
United States Attorney

27

**Exhibit A**

CASE NUMBER: 20-578 (JMV)

# United States District Court
# District of New Jersey

# UNITED STATES OF AMERICA

## v.

# JEFFREY ANDREWS,
# CHAD BEENE,
# ADAM BROSIUS, and
# ROBERT SCHNEIDERMAN

## INDICTMENT FOR

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 371
18 U.S.C. § 2
42 U.S.C. § 1320a-7b(b)(2)(B)

CRAIG CARPENITO
*U.S. ATTORNEY*
*NEWARK, NEW JERSEY*

JASON S. GOULD
*ASSISTANT U.S. ATTORNEY*
*(973) 645-2776*

Exhibit A