# EXHIBIT B

# EXHIBIT 1

# United States District Court
## District of New Jersey

ORIGINAL FILED

JUN - 6 2016

LEDA DUNN WETTRE

IN THE MATTER OF THE SEARCH OF THE ) Mag. No. 16-8069
PREMISES LOCATED AT 1094A AND 1094B MAIN )
AVE., CLIFTON, NJ 07011, WHICH IS MORE ) Hon. Leda Dunn Wettre
PARTICULARLY DESCRIBED IN ATTACHMENT A )
)

## APPLICATION FOR A SEARCH WARRANT

I, Meghan G. Marino, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property (identify the person or describe the property to be searched and give its location):

### See Attachment A

located in the District of New Jersey there is now concealed:

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is (check one or more):
  x  evidence of a crime;
  x  contraband, fruits of crime, or other items illegally possessed;
  x  property designed for use, intended for use, or used in committing a crime;
  __ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of: Title 18, United States Code, Sections 371 (conspiracy), 1035 (false statements relating to health care matters), 1341 (mail fraud), 1343 (wire fraud), 1347 (health care fraud), 1349 (health care fraud conspiracy), and Title 42, United States Code, Section 1320a-7(b) (federal anti-kickback statute)

The Application is based on these facts: **See Attached Affidavit.**

Signature of Affiant
Meghan G. Marino, Special Agent
Defense Criminal Investigative Service

Sworn to before me, and subscribed in my presence

June 6, 2016                     at    4 pm        Newark, New Jersey
Date                                               City and State

Honorable Leda Dunn Wettre
United States Magistrate Judge
Name & Title of Judicial Officer                   Signature of Judicial Officer

**Exhibit B**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

IN THE MATTER OF THE SEARCH
OF THE PREMISES LOCATED AT
1094A and 1094B MAIN AVE.,
CLIFTON, NJ 07011, WHICH IS
MORE PARTICULARLY DESCRIBED
IN ATTACHMENT A

Hon. Leda Dunn Wettre

Mag. No. 16-8069

## **SEALED AFFIDAVIT**

STATE OF NEW JERSEY      )
                                            )      ss.
COUNTY OF  ESSEX          )

Meghan G. Marino, being duly sworn, deposes and says:

1.      I make this affidavit in support of an application for a search
warrant for the premises located at 1094A and 1094B MAIN AVE., Clifton, NJ
07011, which is more particularly described in Attachment A (hereinafter, the
"SUBJECT PREMISES").

2.      I am a Special Agent with the Defense Criminal Investigative Service
("DCIS"), and have been since 2002.  My experience as a DCIS agent has
included the investigation of cases involving health care fraud, financial fraud,
and the use of computers and the Internet to commit fraud.  I have received
training and have gained experience in interview and interrogation techniques,
arrest procedures, search warrant applications, the execution of searches and
seizures, computer crimes, mail fraud, wire fraud, money laundering, health
care fraud, and other computer-based crimes, computer evidence identification,

**Exhibit B**

computer evidence seizure and processing, and various other criminal laws and procedures. I have participated in the execution of various search warrants regarding health care fraud and have assisted in the seizure of evidence. As such, I am a federal law enforcement officer within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure and am thereby authorized to request the issuance of a federal search warrant.

     3.     The information contained in this affidavit is based upon my personal knowledge and observation, my training and experience, conversations with other law enforcement officers, including Special Agents of DCIS, the Federal Bureau of Investigation ("FBI"), the Department of Health and Human Services, Office of Inspector General ("HHS-OIG"), U.S. Department of Veterans Administration, and the review of documents and records, including a review by a Senior Financial Investigator. Additionally, this affidavit contains information provided through publicly available information, witness interviews, discussions with employees and records from Pharmacy Benefit Managers ("PBMs"), as well as TRICARE and other federal health benefit claims data, SCRIPTSAMERICA, INC. ("SCRIPTS") filings with the Securities and Exchange Commission ("SEC"), court filings, and records received pursuant to subpoena.

     4.     Based upon my training and experience, and on conversations that I have had with other law enforcement officers, I am also familiar with the practices and methods of persons who are engaged in health care fraud, and who knowingly submit false and fraudulent claims to federal health care

2

programs and private health care insurers.  Such individuals often create and
maintain records, including claims, bills, invoices, prescriptions, appointment
calendars, correspondence, patient notes, ledgers, e-mails, text messages and
images, which are on computers, stored in electronic or magnetic form.
Furthermore, users of computer equipment often create and maintain records of
computer ownership and subscriptions to internet services.  Based upon this
information, and on the facts set forth below, there is probable cause to believe
that computer-related equipment may contain evidence of the Specified Federal
Offenses at the SUBJECT PREMISES.

  5. Because this affidavit is being submitted for the limited purpose of
establishing probable cause, I have not included every detail of every aspect of
the investigation.  Rather, I have set forth only those facts that I believe are
necessary to establish probable cause to search the SUBJECT PREMISES.
Unless specifically indicated, all conversations and statements described in this
affidavit are related in substance and in part.

  6. Based on my training and experience and the facts as set forth in
this affidavit, there is probable cause to believe that violations of Title 18, United
States Code, Sections 371 (conspiracy), 1035 (false statements relating to health
care matters), 1341 (mail fraud), 1343 (wire fraud), 1347 (health care fraud),
1349 (heath care fraud conspiracy), and Title 42, United States Code, Section
1320a-7(b) (federal anti-kickback statute) (together, the "Specified Federal
Offenses"), are presently located and concealed at the SUBJECT PREMISES.  As

3

such, there is probable cause to search the SUBJECT PREMISES, as described in Attachment A, for evidence, instrumentalities, contraband and fruits of these crimes, as further described in Attachment B.

## **BACKGROUND AND PROBABLE CAUSE**

7.    TRICARE is a health care benefit program for Uniform Service Members of the U.S. military (active, Guard/Reserve, or retired) and their families.  Individuals who receive health care benefits through TRICARE are referred to as TRICARE beneficiaries.  TRICARE is managed by the Defense Health Agency at the U.S. Department of Defense.  Express Scripts, Inc. ("Express Scripts") administers TRICARE's prescription drug benefit plan, as a PBM, by adjudicating or determining whether to pay pharmacies for claims that a pharmacy submits to Express Scripts.

8.    Like other insurance plans, TRICARE pays for medical services on a fee-for-service basis, with the typical plan members responsible for paying a yearly deductible and a percentage copayment for covered services.  TRICARE enters into agreements with various health care providers, who are referred to as "contracted" or "in-network" providers that agree to accept reimbursement from plan members at established rates.

9.    Medicare is a federal health insurance program which is administered by the United States Department of Health and Human Services, Center for Medicare and Medicaid Services ("CMS") and provides payment for reasonable and medically necessary medical services for people over 65 and

4

disabled or blind persons under 65. Medicare is divided into Part A (hospital insurance), Part B (outpatient physician services), Part C (managed care) and Part D (prescription drug coverage).

10.     Part D provides coverage for outpatient prescription drugs. Medicare beneficiaries can obtain Part D coverage in two ways: (1) they can enroll in one of the many prescription drug plans, which cover only prescription drugs and are offered by private insurance companies; or (2) they can join a Medicare Advantage plan that covers prescription drugs and medical services. Individuals who receive health care benefits through Medicare are referred to as Medicare beneficiaries. Express Scripts administers Medicare's prescription drug benefit plan, as a PBM, by processing claims.

11.     Medicare prescription drug plans commonly provide beneficiaries with an identification card, which the beneficiaries can present at pharmacies in order to have their prescriptions filled. Medicare generally covers the cost of the prescription, with the beneficiaries responsible for paying any deductible or co-payment required by their prescription drug plan.

12.     TRICARE and Medicare are "health benefit program[s]" as defined by 18 U.S.C. § 24(b) that affect commerce, and are "Federal health care program[s]," as defined by 42 U.S.C. § 1320a-7b(f) that affect commerce.

## CONDITIONS FOR AUTHORIZED PHARMACY PROVIDERS FOR RECEIVING PAYMENT UNDER TRICARE AND MEDICARE

13.     In order for a pharmacy, such as MAIN AVENUE PHARMACY INC., a/k/a "Main Avenue Pharmacy Corp." ("MAIN AVE."), to receive reimbursement

5

**Exhibit B**

from TRICARE, Medicare, and private insurance companies for prescription drugs provided to beneficiaries and claimants, the pharmacy must submit its prescription claims for payment to the beneficiary's plan using the beneficiary's TRICARE number, the Medicare Health Care Identification Number, and/or plan identification number. The pharmacy submits for processing and adjudication claims to a PBM such as CVS/Caremark or Express Scripts (for Tricare and Medicare). Once the PBM adjudicates the claim, a payment is disbursed to the pharmacy by either warrant (which is similar to a bank check) or by electronic funds transfer, then TRICARE, Medicare, or a private insurance company, often through a sponsored plan, pays the PBM directly.

14.     Compounding is a practice where a licensed pharmacist combines, mixes, or alters ingredients of a drug in response to a prescription to create a medication tailored to the medical needs of an individual patient. In theory, compounded prescriptions benefit patients who need specific dosage strengths, are limited to a particular route of administration (e.g. cannot swallow a pill), or need ingredients excluded from medications due to allergies or other sensitivities. Pharmacies engaged in the practice of dispensing compounded drugs are referred to as "compounding pharmacies." There are various rules and regulations setting forth the circumstances under which PBMs will cover compounded prescriptions. As part of a prescription compounding fraud scheme, a pharmacist may choose the ingredients in a compounded medication/cream based upon their profitability to the pharmacist (even though

6

they are not medically necessary) rather than use already existing formulations which have much lower profit margins. As a result, the patient will pay a very low charge to fill a prescription, but the pharmacy will bill the insurer at a large markup. The pharmacy may then use the profits to make kickback and illegal monetary payments to physicians, marketers, telemarketers and others for the personal identification information of additional beneficiaries to whom the pharmacy can supply with compound medications and bill insurance companies.

15.     MAIN AVE. is a compounding pharmacy, located at the SUBJECT PREMISES,[1] which, among other things, prepares and supplies specialty compounded medication/creams to beneficiaries. MAIN AVE. is a wholly owned subsidiary of SCRIPTSAMERICA INC. ("SCRIPTS")[2], an OTC publicly traded corporation.[3]

---

[1] I have reviewed SCRIPTS's second addendum to its lease for the SUJECT PREMISES, which indicates that the pharmacy expanded from 1094A Main Street into the adjacent 1094B Main St., (which formerly was Belle Fiore floral and wedding shop) in or about December 2014. On or about June 3, 2016, I spoke with the owner of a pizza shop located next to the SUBJECT PREMISES, who corroborated the pharmacy's expansion into 1094B. Additionally, on or about June 3, 2016, I called the phone number listed on the green awning of 1094B, and was told by the individual who answered the phone that Belle Fiore moved to a different location approximately a few years ago.

[2] During 2015, SCRIPTS changed its corporate address from a virtual office space, located at Corporate Office Centre Tysons II, 1650 Tysons Boulevard, Suite 1580, Tysons Corner, VA 22103 to 1094A Main Ave. at the SUBJECT PREMISES.

[3] SCRIPTS states in its SEC filings that "Main Ave. focuses on the development and sale of prescription pain creams which contain up to eight active pharmaceutical ingredients for application on the skin, resulting in minimal systemic absorption and a reduction of possible side effects. Main Avenue's products require a prescription from a physician, are shipped directly to the patient and are billed through the patient's insurance provider."

7

16.     Since in or about Fall 2015, Special Agents with DCIS, FBI, HHS-OIG, U.S. Department of Veterans Affairs, and others have been engaged in an investigation in New Jersey, New York, and elsewhere involving MAIN AVE., SCRIPTS and others known and unknown for violations of the Specified Federal Offenses. The agents have been investigating: (i) fraud in the prescription of compound medications/creams (including pain/scar creams and vitamins/metabolic supplements) ("medications/creams"); and (ii) fraud in the submission of false and fraudulent claims for the filling and dispensing of compound medications/creams which were not medically necessary and/or were not requested by the beneficiary. The agents are also investigating related illegal monetary payments and kickbacks between compounding pharmacies, marketing companies, telemarketing companies, and physicians. Since TRICARE and Medicare are federal health benefit programs, such kickback payments, if they were made in return for arranging for prescriptions of compounded drugs for which TRICARE or Medicare were providing payment, may be in violation of the federal anti-kickback statute.

17.     From the investigation to date, it appears as though MAIN AVE. has received monies as a result of its submission of false and fraudulent claims for the filing and dispensing of compounded medication/creams which were not medically necessary.

18.     Additionally, it appears as though, in furtherance of its fraud scheme, MAIN AVE. paid kickbacks and illegal monetary payments to marketers

8

and telemarketers who recruited beneficiaries of certain health care plans, including TRICARE and Medicare, among others, to participate in a compounding scheme, directing beneficiaries to specific doctors located throughout the United States to obtain prescriptions for unnecessary[4] prescriptions for certain compounded medications which were then filled at MAIN AVE. As part of this scheme, it appears as though specific telemedicine doctors, who did not have any prior or subsequent physician-patient relationship with beneficiaries, wrote prescriptions for compounded medication/cream that were filled by MAIN AVE. It also appears that the telemedicine doctors are being paid a kickback by marketing companies to approve the compounding prescriptions. Furthermore, it appears as that some beneficiaries had their personal information stolen and that, in some instances, prescription compounded medication/creams were billed to beneficiaries' insurance without their knowledge or consent.

19. Pursuant to the ongoing investigation, law enforcement agents have reviewed numerous databases relative to MAIN AVE. According to this review:

(a) MAIN AVE. was incorporated on January 14, 2011, by Dmitriy Naydenko and functioned as a neighborhood/retail pharmacy until in or about 2014 when it became a compounding pharmacy;

---

[4] The investigation to date has shown that ingredients in the compounded medications/creams were frequently changed, including sometimes changed by the pharmacies themselves without consultation with the prescribing physicians with the goal of maximizing reimbursement from the insurance companies.

9

(b) Since in or about May 2011, MAIN AVE. has been using the National Provider Identification ("NPI") registry number 1255623112. This number is recognized by Medicare and many commercial insurance carriers, which receive claims for reimbursement for, among other things, prescriptions that were billed by MAIN AVE. to the various insurance carriers. The NPI system is administered by CMS and is a national repository of data for individuals and entities that provide healthcare services to, among other populations, Medicare and Medicaid beneficiaries;

(c) The NPI system identifies MAIN AVE.'s mailing and physical location as 1094A Main Ave. at  the SUBJECT PREMISES;

(d) Alix Vincent is identified as Pharmacist in Charge ("PIC") and Nanci Lieneck is the Operations Manager and the Authorized Signatory for MAIN AVE.; and

(e) A review of claims for reimbursement submitted by MAIN AVE. to both Medicare and TRICARE reflects that MAIN AVE. uses the aforementioned NPI number when seeking payment for the dispensing of medications, including compounded medication/creams.

## SCRIPTSAMERICA's FILINGS WITH THE SEC

20.    SCRIPTS is an OTC publically traded corporation under the oversight of the SEC.  MAIN AVE. is wholly owned by SCRIPTS.  According to SCRIPTS filings with the SEC and MAIN AVE. documents provided to Express

10

Exhibit B

Scripts, on or about January 29, 2011, Implex Corporation, a consulting business owned by the legal counsel for SCRIPTS, Richard C. Fox, Esq. ("Fox"), entered into a stock purchase agreement to acquire MAIN AVE. from its owner, Dmitriy Naydenko, for $550,000.

21.    MAIN AVE. entered into a Business Management Agreement with SCRIPTS, effective February 7, 2014.   Under this agreement, Implex engaged SCRIPTS to manage the day-to-day operations of MAIN AVE.   The day-to-day management responsibilities included financial management but excluded matters related to licensing, for which Implex retained responsibility.

22.    On April 1, 2014, the Business Management Agreement was amended so that for its management services, SCRIPTS would receive 100% of the profits and losses of MAIN AVE.

23.    On October 1, 2014, Implex's ownership in MAIN AVE. was transferred to SCRIPTS for no additional consideration and as such SCRIPTS owns 100% of the assets and outstanding common stock of MAIN AVE.

24.    SCRIPTS's SEC filings indicate that prior to the SCRIPTS acquisition, MAIN AVE. had no significant sales and that the pharmacy was acquired for its Pharmacist and license.  After the acquisition, MAIN AVE. was transformed from a community/retail pharmacy into a compounding pharmacy. A review of MAIN AVE.'s Wells Fargo business bank account records has

11

Exhibit B

revealed that between August 8, 2014, and January 4, 2016, approximately $20,984,109 was transferred from MAIN AVE. directly to SCRIPTS.[5]

25.    SCRIPTS reported that MAIN AVE. generated approximately $29 million in sales revenue during fiscal year 2014, and that 97% of SCRIPTS's net revenues were derived from the operations of MAIN AVE.[6]

## RISE IN COMPOUNDED MEDICATIONS

26.    A hallmark of a compounded prescription drug scheme is the rapid rise in the number and volume of high-cost prescription compounded medication/creams, which are often associated with a marketer and/or a prescribing physician who are involved in a kickback relationship with a compounding pharmacy.  In some cases, the pharmacies enlist co-conspirators, who agree to create "sham businesses," in order to conceal the true owners and primary operators of the business.  The operator of these sham businesses often open other investments and bank accounts in order to move the proceeds from TRICARE, Medicare, and private insurance companies, which were obtained through false and fraudulent billings, to facilitate and conceal the illegal kickback and monetary payments, and to launder the illicit proceeds.

---

[5] Many of these transfers have annotation regarding the purpose of the transfer and appear to be for "commissions."  Examples of these annotations are: "COMMISSIONS FOR MAIN MM" "BRAVERMAN MM COMMISSIONS" "COMMISSION SHN;" "COMMISSION MM;" 'COMMISSION MM BRAVERMAN;" "BIOTECH;" "COMMISION BIOTECH;" "COMMISSION PREMIER BIOTECH SOLUTIONS;" "COMMISSION IAN;" "COMMISSION PHARMA SALES."

[6] SCRIPTS states in its SEC filings that their current operations involve the "sale and compounding of non-sterile topical and transdermal pain creams through Main Ave."

12

Exhibit B

27.     Both MAIN AVE. and SCRIPTS have relationships with multiple outside marketing consulting companies.  For example, in 2014, SCRIPTS paid Black Cat Consulting, which is owned by the current President and Director of SCRIPTS, Adam Brosius,[7] $51,017 in cash and SCRIPTS issued 1,500,000 shares of SCRIPTS common stock, valued at approximately $210,000, for "consulting fees" to Black Cat Consulting.  In two checks written between October 31, 2014, and November 18, 2014, MAIN AVE. paid Black Cat Consulting approximately $35,000.

28.     During fiscal year 2015, SCRIPTS also paid Pharma Sales Group, Inc. ("Pharma Sales"), which is also owned by Brosius, approximately $17,964,247, for "commission fees."  According to SEC filings, Pharma Sales paid various marketing groups on the behalf of SCRIPTS.  A review of the Wells Fargo Bank, MAIN AVE. business bank account records revealed that from December 16, 2014 to December 24, 2015, MAIN AVE. paid Pharma Sales approximately $16,475,666.

29.     MAIN AVE. also paid Medi Biotech, LLC ("Medi Biotech") for telemarketing.[8]  A review of the MAIN AVE. Wells Fargo business bank account records revealed that from June 5, 2014, through October 13, 2015, MAIN AVE. paid Medi Biotech approximately $4,984,08.

---

[7] Prior to being appointed President of SCRIPTS, Brosius served as the interim president and the National Sales Manager for SCRIPTS.  Between April 6, 2015, and November 4, 2015, MAIN AVE. paid Brosius approximately $408,695.22, not including payments for his credit card.

[8] SCRIPTS's SEC filings state that Medi Biotech was providing "billing services."

13

Exhibit B

30.    A review of the MAIN AVE. Wells Fargo business bank account records, reveals that SCRIPTS executives have signature authority for the accounts, including Fox, Brosius, Robert Schneiderman and Jeffrey J. Andrews. Schneiderman served as the SCRIPTS Chief Executive Officer and director since its inception on May 12, 2008, through June 30, 2015. Andrews has served as the Chief Financial Officer of SCRIPTS since October 2010. He is also the owner of Powell Strategic Advisors, Inc., a financial consulting company, which from January 22, 2015, through April 13, 2015, received approximately $164,000 from MAIN AVE. Andrews is also an owner of Troy Pharmacy, located at 8 Cushman Rd. Bryn Mawr, PA 19010.[9]  Troy Pharmacy, d/b/a "SCRIPTS" received approximately $130,292 between June 15, 2015, and September 10, 2015 from MAIN AVE.

31.    A review of MAIN AVE.'s Wells Fargo business bank account records revealed that during 2014 and 2015 there were numerous additional payments to entities that appear to be tied to marketing companies, including:

| **Date** | **Entity** | **Approximate Amount    Received from MAIN V.** |
|---|---|---|
| 5/20/14 to 12/22/14 | Baltz Marketing | $126,800 |
| 3/27/14 to 2/23/15 | PharmanosticsGroup LLC | $1,591,472 |
| 3/27/14 to 7/25/14 | Premier Bio-Tech Solutions | $1,106,643 |

---

[9] This location is a house which has been affiliated with Andrews.

14

| 3/6/14 to 7/22/14 | SHN Marketing | $3,639,883 |
| 2/23/15 to 5/26/15 | International Home Plans / DBA SHN | $1,434,415.81 |
| 8/7/14 to 3/15/15 | Schaefer, Ian Inc. | $675,201 |

32.     SCRIPT's  SEC filings note that during 2014, "selling costs increased approximately by $27,000,000 compared to the same period in 2013. . . a significant portion of this increase is due to sales commissions paid by MAIN AVE., which were approximately $24,300,000." From the investigation to date, it appears that MAIN AVE. and SCRIPTS, acting as one, paid marketers commissions from sales revenue generated by the compounded prescriptions. These marketers were used as intermediaries between the health care professionals who wrote unnecessary prescriptions for compound medications and MAIN AVE. Based upon my training and experience, and that of the team in this investigation, there appears to be no legitimate business or accounting reason to pay these commissions to the marketing and telemarketing companies. It appears as though this commission structure was established in an attempt to further remove MAIN AVE., SCRIPTS and the co-conspirators from the fraudulent scheme detailed herein.

33.     Notably, the significant payments to marketers and telemarketers correlated with a rapid increase in sales for MAIN AVE. On August 4, 2014, SCRIPTS released a press release which noted that "July [2014] represents [MAIN AVE.'s] fourth consecutive month of reporting record high sales.

15

**Exhibit B**

$4,0900,000 [in approved order sales] marks a 51% monthly revenue increase over June [2014] and [sic] 728% increase when compared to March 2014, the first full month of pharmacy's operations while under" SCRIPTS management.

**TRICARE RECORDS**

34.   In the course of this investigation, law enforcement agents have reviewed and analyzed MAIN AVE.'s claims submitted to TRICARE, and reimbursements the pharmacy received from TRICARE.  According to a Express Scripts provider enrollment form, which I have reviewed, on June 2, 2014, Vincent, as the PIC for MAIN AVE., applied to be a Express Scripts provider, accepted the conditions of being a provider and completed a form which listed Express Scripts as the program benefits manager that would be issuing payments to MAIN AVE.

35.   Between June 2014 and May 8, 2015, MAIN AVE. submitted 1,058 compound medication claims to Express Scripts for TRICARE beneficiaries. These totals are broken down as follows:

| Period | Claims | Billed | Paid |
|---|---|---|---|
| Jan. 2014-May 2014 | 0 | $0 | $0 |
| June 2014-Dec. 2014 | 105 | $778,547.01 | $645,325.45 |
| Jan. 2015-May 8, 2015 | 953 | $6,312,395.79 | $5,152,626.80 |
| Total | 1,058 | $7,090,942.79 | $5,797,952.25 |

36.   Based on my training and experience, and that of other law enforcement agents to whom I have spoken, the rapid increase in the compound

16

medication billings and payments noted above constitute the type of billing and reimbursement spiking that is indicative of health care fraud.

## **MEDICARE RECORDS**

37.     In the course of this investigation, law enforcement agents have reviewed and analyzed claims submitted by MAIN AVE. to Medicare, and reimbursements the pharmacy received from Medicare.

38.     Between 2013 and 2015, MAIN AVE. submitted 58 compound medication claims to Medicare, for which it was paid approximately $659,853. These totals are broken down as follows:

**Compounds (scar and wound care)**

| Period | Claims | Paid |
|---|---|---|
| Jan. 2014-Dec. 2014 | 0 | $0 |
| Jan. 2015-Dec. 2015 | 15 | $157,904 |
| Jan. 2016-Apr. 2016 | 43 | $501,949 |
| Total | 58 | $659,853 |

39.     Of these, 34.37% of all scripts for Medicare beneficiaries filled by MAIN AVE. were for wound care cream and 4.20% of all scripts filled by MAIN AVE. for Medicare beneficiaries were for scar care cream.

17

**Exhibit B**

40.     Furthermore, MAIN AVE. recently has rapidly increased prescriptions for Diclofenac and Lidocaine, as set forth below:

### Diclofenac

| Period | Claims | Paid |
|---|---|---|
| Jan. 2014-Dec. 2014 | 0 | $0 |
| Jan. 2015-Dec. 2015 | 0 | $0 |
| Jan. 2016-Apr. 2016 | 66 | $143,849 |
| Total | 66 | $143,849 |

### Lidocaine

| Period | Claims | Paid |
|---|---|---|
| Jan. 2014-Dec. 2014 | 0 | $0 |
| Jan. 2015-Dec. 2015 | 0 | $0 |
| Jan. 2016-Apr. 2016 | 132 | $176,521 |
| Total | 132 | $176,521 |

41.     Based on my training and experience, and that of other law enforcement agents to whom I have spoken, the rapid increase in the compound medication billings and payments set forth above constitute the type of billing and reimbursement spiking that is indicative of health care fraud.

42.     Furthermore, between February 24, 2015, and March 2, 2016, 24.95% of all Part D prescriptions, $426,854, originated from one provider, Dr.

18

Robi Rosenfeld.[10]  Based on my training and experience, and that of other law enforcement agents to whom I have spoken, it is an indicator of health care fraud to have a single physician prescribe such a large percentage of prescriptions, especially when, as here, the prescribing physician is situated in a different state than the state in which the pharmacy is located and when, as here, the health care provider is a telemedicine doctor.

## **CVS/CAREMARK AUDIT AND RECORDS**

43.    I have had conversations with auditors and employees from CVS/Caremark and reviewed CVS/Caremark records relating MAIN AVE.  A review of CVS/Caremark's records indicates that they paid MAIN AVE. approximately $16,668,942 between May 1, 2013, and May 31, 2014.

44.    After receiving complaints from beneficiaries that the beneficiaries had received prescriptions from MAIN AVE. without either requesting the prescriptions or visiting the doctors listed on the prescriptions, CVS/Caremark conducted an audit between May 1, 2013, and May 31, 2014.

45.    In a letter to MAIN AVE. from CVS/Caremark dated April 2, 2015, CVS/Caremark concluded that its audit revealed that "Main Avenue has committed multiple substantial violations of its obligations under its August 30,

---

[10] Dr. Rosenfeld's address of record for his NPI number is in Muncie, NY. Dr. Rosenfeld has had Medicare provider numbers in New Jersey, Maine and Massachusetts; however, none of these are currently active. Thus, Dr. Rosenfeld does not have an active Medicare number. Additionally, Dr. Rosenfeld has zero dollars in Part B billing, which based upon the training and experience of the HHS-OIG agent assigned to this case, means that he has not billed Medicare for any services, including patient physical examinations.

Exhibit B

2011 Provider Agreement." The letter further stated that, "In order for a prescription drug order to be valid, it must be based upon an acceptable practitioner-patient relationship under applicable law, and such practitioner-patient relationship did not exist for these prescriptions."

46. The CVS/Caremark audit also found other violations and inaccuracies, including the fact that MAIN AVE. told CVS/Caremark that less than 25% of MAIN AVE.'s business is mail order, when in fact information from a SCRIPTS investor presentation indicated that prescriptions from MAIN AVE. are sent via mail (Federal Express) to patients. A review undertaken by CVS/Caremark of MAIN AVE.'s claims indicated that MAIN AVE. "overwhelmingly dispenses prescriptions via mail order."

47. Additionally, the CVS/Caremark audit also found that MAIN AVE. was not licensed as a pharmacy in several states it was servicing and where it had mailed prescription drug medications.

48. During the spring of 2015, CVS/Caremark notified MAIN AVE. that it was terminating its business and provider agreement. In its SEC filings, SCRIPTS states that "no basis for the [MAIN AVE.'s] termination was provided." However, upon review of CVS/Caremark's audit records and conversations with CVS/Caremark auditors assigned to this matter, MAIN AVE. was given approximately seven opportunities to cease their conduct, sent multiple letters explaining their breach of the provider agreements with CVS/Caremark, and

20

were repeatedly told that their practice of using bulk compounds was not in compliance with their provider contract with CVS/Caremark.

## EXPRESS SCRIPTS AUDIT AND RECORDS

49.     On or about March 6, 2015, Express Scripts submitted a cease and desist notice to MAIN AVE. and subsequently terminated its contract with the pharmacy.  Investigators from Express Scripts have told law enforcement agents that there were three issues with patient safety/harm that led to the termination of MAIN AVE.'s contract: (1) MAIN AVE.'s compounded creams did not list the individual ingredients contained in the compound, creating an issue with potential adverse reactions for patients if they did not know what was contained in the compound; (2) there are recordings between an Express Scripts representative and an employee of MAIN AVE. who was not a clinician, where the MAIN AVE. employee provided clinical discussions; and (3) Express Scripts investigators spoke to a prescribing physician who denied that he ever prescribed compounds to a Express Scripts plan member who was sent compounded medication by MAIN AVE.

## TRICARE BENEFICIARY INTERVIEWS

50.     On or about March 1, 2016, pursuant to this investigation, TRICARE beneficiary H.B., who lives in Florida, was interviewed.  H.B. related that he/she received a prescription for scar cream from MAIN AVE., which was delivered by FedEx and had a return address at the SUBJECT PREMISES.  H.B. called MAIN AVE. to question the prescription because he/she does not reside in

21

New Jersey, where the pharmacy is located, MAIN AVE. is not his/her pharmacy, and the doctor listed on the prescription (Dr. Richard Wolff[11]) has never been his/her doctor. H.B. stated that when he/she called MAIN AVE. he/she spoke to an individual who tried to convince him/her to use the scar cream. H.B. further stated that he/she received approximately fifteen (15) bottles of compounded medication and that costs billed to TRICARE amounted to approximately $68,000. H.B. also reported that his/her spouse also received unsolicited prescription cream from MAIN AVE, which were also prescribed by Dr. Wolff. H.B.'s spouse has never been cared for by Dr. Wolff. H.B. informed the agents that he/she contacted MAIN AVE. at least ten times requesting they stop sending prescriptions. H.B. stated that neither H.B. nor his/her spouse used the medication that they were sent by MAIN AVE.

51.    I have reviewed the TRICARE records for H.B. and H.B.'s spouse. A review of those claims submitted by MAIN AVE. between November 15, 2014, and April 9, 2015, revealed that TRICARE was billed approximately $100,048.15 for seven compounded prescriptions for H.B. and/or H.B.'s spouse, and that MAIN AVE. was paid approximately $85,122.91 by TRICARE for those prescriptions.

52.    On or about March 1, 2016, TRICARE beneficiary D.B., who lives in Florida, was interviewed pursuant to this investigation. D.B. related that he/she received a prescription for scar cream from MAIN AVE., which was delivered by

---

[11] Dr. Wolff has a medical practice based in Donalsonville, GA.

22

UPS. D.B. stated that he/she called MAIN AVE. to question the prescription because although he/she utilized pain cream, this prescription was different than the one that he/she receives through the Veterans Administration. D.B. noted that he/she does not reside in New Jersey, where the pharmacy is located, MAIN AVE. is not his/her pharmacy, and the doctor listed on the prescription (Dr. Richard Wolff) has never been his/her doctor. D.B. stated that when he/she contacted MAIN AVE., the pharmacy's representative insinuated that they were affiliated with TRICARE. D.B. was further told that the pain cream he/she received from them was similar to the pain cream he/she used previously, only better. When D.B. further questioned the MAIN AVE. representative, the conversation was cut short. D.B. contacted TRICARE after receiving a statement from TRICARE which showed a charge for compounded medication from MAIN AVE. D.B. stated that he/she did not use the MAIN AVE. pain cream.

53. D.B. provided the undersigned with pictures of the prescription he/she received from MAIN AVE. The prescription label lists MAIN AVE.'s address as 1094A Main Street at the SUBJECT PREMISES. Additionally, the phone number (973) 928-0208 is the same phone number on the outside awning of 1094A Main Street at the SUBJECT PREMISES as described in Attachment A.

54. I have reviewed TRICARE records for D.B. On March 7, 2015, MAIN AVE. billed TRICARE $5,710.82 for a single prescription, and MAIN AVE. was paid approximately $4,446.92.

23

55. On or about March 1, 2016, TRICARE beneficiary G.V., who lives in Florida, was interviewed pursuant to this investigation. G.V. stated that shortly after receiving treatment at Perfect Feet Care, 13651 SW 26th St., Miami, FL, G.V. received a prescription from MAIN AVE., which was delivered by either UPS or FedEx. G.V. called MAIN AVE. to question the prescription, as he/she was not advised by Perfect Feet that he/she needed prescription medication, and spoke to a representative from the pharmacy. That representative tried to convince him/her to use the medication sent to him/her by MAIN AVE. G.V. informed the representative he/she did not want the prescription. Subsequently, G.V. received a second shipment from MAIN AVE. which he/she refused to accept. G.V. received a TRICARE statement which showed a cost to TRICARE in the amount of $7,000 for the prescription, so he/she contacted TRICARE to complain about the prescription and bill.

56. I have reviewed TRICARE records for G.V. The amount paid by TRICARE was reversed by MAIN AVE. after G.V. complained about the prescriptions.

57. On or about March 10, 2016, P.S., a TRICARE beneficiary, who lives in Pennsylvania, was interviewed pursuant to this investigation. P.S. related that he/she received several prescriptions for back pain from MAIN AVE., which were delivered by FedEx. P.S. contacted his/her regular doctor to see if he/she sent him/her the prescriptions and was told that he/she did not. P.S.

24

noted that the doctor on the prescription (Dr. Bernard Ogon[12]) was not his/her doctor. P.S. also reported that the name Edwin Casado was the listed pharmacist. P.S. contacted MAIN AVE. to inquire about why he/she was sent the prescriptions. P.S. stated the MAIN AVE. representative tried to convince him/her to utilize their topical pain cream and advised him/her that MAIN AVE.'s cream was a better medication than what his/her primary physician provided to him/her.

58.    I have reviewed TRICARE records relating to P.S. A review of those claims indicated that on January 22, 2015, and March 31, 2015, MAIN AVE. billed TRICARE approximately $54,118.30 for three prescriptions and TRICARE paid MAIN AVE. approximately $44,771.66 for compounded prescriptions.

## MEDICARE BENEFICIARY INTERVIEWS

59.    On or about May 13, 2016, V.W., a New Jersey resident who is a Medicare beneficiary, was interviewed pursuant to this investigation. V.W. reported that he/she recently received two boxes containing compounded medications, such as scar cream and tubes of lidocaine, from MAIN AVE., but she did not know where the pharmacy was located. The doctor listed on the prescriptions was Dr. Lisa Rink, who is V.W.'s doctor.

60.    Subsequently, on or about May 13, 2016, Dr. Lisa Rink was interviewed. Dr. Rink's Office is located in Haddon Heights, N.J. Dr. Rink stated that she has never heard of MAIN AVE. and would have no reason to refer any of

---

[12] Dr. Ogon practices in both New Jersey and Pennsylvania.

Exhibit B

her patients to a pharmacy in Clifton, which is far from her office. Dr. Rink denied that she wrote prescriptions for V.W. for scar cream.

61. Medicare records for V.W. have been reviewed, which revealed that on or about February 16, 2016, the Medicare program paid MAIN AVE. approximately $3,713.88 for prescriptions filled by the pharmacy. An HHS-OIG agent assigned to this investigation has advised me that the claims submitted to the Medicare program by MAIN AVE. on behalf of prescriptions sent to V.W. included a claim for reimbursement for a medication called Diclofenac.

62. On or about May 19, 2016, R.K. and D.K., who reside New Jersey, were interviewed. R.K. is a Medicare beneficiary and D.K. has insurance through the State of New Jersey.[13] D.K. related that he/she received phone calls from two individuals who informed him/her that he/she could receive medications at no cost to him/her. Both individuals recited a list of ailments and asked if D.K. suffered from any of them. D.K. was asked if he/she suffered from migraines, and he/she responded that he/she did not but that his/her daughter suffered from migraines. Sometime after these phone calls, both R.K. and D.K. began to receive prescriptions through the mail from MAIN AVE. The doctor listed on the prescriptions was Dr. Robi Rosenfeld, who is not their doctor. R.K. and D.K. noted that they have also been receiving bills for balances due to MAIN AVE. The bills included a pre-stamped envelope with their own name and address already completed for the return address. D.K. related that

---

[13] To date, D.K.'s insurance claims have not been reviewed.

Exhibit B

he/she has also repeatedly received phone calls from a representative of MAIN AVE. seeking the balance of bills. Neither R.K. nor D.K. have taken or otherwise used any of the MAIN AVE. prescription medications.

63. HHS-OIG agents have advised me that Medicare records for R.K. were reviewed relative to claims submitted by MAIN AVE. for prescriptions mailed to him/her. A review of those claims revealed that the Medicare program paid MAIN AVE. approximately $2,259.45 for prescriptions filled on or about February 25, 2016.

## DIABETIC TEST SCHEME

64. During the course of this investigation, I learned that agents with HHS-OIG have been in contact with individuals employed by Abbott Diabetic Care ("ADC"). ADC is a division of Abbott Labs, an international company that manufactures, among other things, diabetic testing strips ("DTS"). DTS are used pursuant to a prescription for the purpose of testing blood sugar (glucose) levels in diabetic patients. DTS are covered under various private and government insurance programs, including the Medicare program.

65. In an effort to seek a market share, and to maintain cost controls, ADC contracts with these various insurance plans to have their DTS placed on the formulary for the insurance plans. By agreeing to place ADC DTS on the formulary, the plan is entitled to receive a rebate from ADC. The rebates are paid by ADC after the insurance plan pays the dispensing pharmacy for the DTS, based upon a claim for reimbursement from the pharmacy. ADC tracks the

27

number of DTS that are sold via ADC's network of authorized wholesalers. As such, ADC is able to identify pharmacies that have sought reimbursement from insurance plans, as the insurance plans must report back to ADC the number of DTS that the insurance plan paid for in a given quarter.

66. ADC provided HHS-OIG agents with summary data for MAIN AVE., relative to the number of DTS that MAIN AVE. sought reimbursement for from the various insurance plans, including the Medicare program. During the 4th quarter of 2014 (October-December 2014) through the 4th quarter of 2015 (October-December 2015), insurance plans around the United States paid MAIN AVE. for dispensing a total of 77,350 DTS. In return, the various insurance plans sought rebates from ADC for 77,350 DTS. According to records from ADC, MAIN AVE. did not purchase any DTS from ADC or any of its authorized wholesalers during that same time period. Individuals at ADC have advised that pharmacies normally maintain a limited stock of DTS, due to the cost associated with maintaining a high inventory of DTS. Thus, it appears as though DTS that were provided to patients from MAIN AVE. are untraceable, as their original source is unknown.

67. As set forth above, in carrying out the fraudulent scheme described above, there is probable cause to believe that the SUBJECT PREMISES contain evidence of MAIN AVE.'s and others' commission of the Specified Federal Offenses.

28

## TECHNICAL BACKGROUND AND ITEMS LIKELY TO BE FOUND

### A. Business and Financial Records

68.     From my experience as a health care fraud investigator, and the experience of other law enforcement officers involved in this investigation, I have knowledge of common business practices. In particular, I am aware that pharmacies often maintain records relating to patient information, billing and payment records, medication dispensed and potential contraindications for medicines at their place of business.

69.     Also, I am aware that, pursuant to Title 42, Code of Federal Regulations, Section 405.2139(e), Medicare and Medicaid providers are required to maintain patient records for at least 5 years, and the State of New Jersey requires that all patient treatment records be maintained for 7 years from the date of the most recent entry. *See* Title 13, New Jersey Administrative Code, Section 35-6.5.

70.     Additionally, I know from my training and experience, and that of the agents with whom I have communicated prior to making this affidavit, that individuals who are engaged in complex white collar crimes, such as health care fraud, wire fraud and mail fraud, often maintain documents in both paper and electronic form. Based upon my experience, there is probable cause to believe that the business records of MAIN AVE. and SCRIPTS, including but not limited to e-mails, correspondence with, and records of payments concerning the scheme, correspondence between members of the scheme, correspondence with

29

**Exhibit B**

marketing companies, PBMs, including TRICARE, Express Scripts and CVS/Caremark, teledoctors, physicians, nurse-practitioners and physician's assistants, personnel records, patient files and billing records, written orders or prescriptions, referring provider documentation and patient referral documents, financial statements, and addresses and telephone numbers of business associates, other marketing companies, web portals, and other persons and entities, are located at the SUBJECT PREMISES.

71.     Based on my knowledge, training, and experience, the financial books, records, and documents constituting bank accounts, money market accounts, checking accounts, investment accounts, stock fund accounts, 401K funds, mutual funds, retirement funds, bonds or bond funds, including deposits and disbursements, cancelled checks or draft electronic transfers, ledgers, and credit card/ATM/debit card accounts are also retained by businesses. Based on my training and experience, businesses often keep such records on computers and electronic media. As such, there is probable cause to believe that the SUBJECT PREMISES will contain business records documenting the fraudulent scheme described herein.

72.     Based upon my training and experience, contracts, agreements, logs, lists or papers, including records of payments are also retained by health care businesses.

73.     Based on my knowledge, training, and experience, businesses maintain files listing any and all employee (including sales representative or

30

contractor) names, addresses, telephone numbers, e-mail addresses, tax records, and background information.

74.     Based upon my knowledge, training and experience, businesses have locked rooms, cabinets, desks and containers, including filing cabinets and safes, which likely contain records and other evidence sought by this application. I, therefore, seek permission to use necessary force to open any locked rooms, cabinets, desks, and containers, including filing cabinets and safes, during the execution of this warrant.

75.     Additionally, I request permission to photograph and create a video recording of the SUBJECT PREMISES.

76.     As such, I respectfully request issuance of a search warrant for business records and documents, in whatever form they are kept, and items, as described more specifically in Attachment A, which constitutes evidence and instrumentalities of violations of the Specified Federal Offenses.

### B. Searching and Seizing Electronic Storage Media

77.     In my experience, and in those agents involved in this investigation, it is normal and customary for businesspeople, including entities such as MAIN AVE. and SCRIPTS, to maintain diaries, appointment logs and calendars, telephone records, materials detailing contacts, routes and patient appointments, and correspondence with insurance providers, including TRICARE and Medicare, for years after their creation or receipt. These records contain vast amounts of material useful to running businesses day-to-day, and

31

consequently are kept close at hand or in electronic software. It is also likely that participants of the scheme are regularly using e-mail and electronic methods to communicate with one another.

78.     Based on my training and experience, there is probable cause to believe that a computer or computers containing records concerning the scheme are maintained at the SUBJECT PREMISES for the purposes of conducting business transactions, record keeping, expansion plans, and contracts with marketing and other companies. There is also probable cause to believe that computers containing MAIN AVE. and/or SCRIPTS's business records are maintained by the co-conspirators at the SUBJECT PREMISES for the purposes of conducting business transactions, record keeping, and other related tasks. There is also probable cause to believe that communications concerning the fraudulent scheme are contained within the cellular telephones used by the employees of MAIN AVE. and/or SCRIPTS.

79.     *Electronic Storage Media.* As used in this affidavit, the term "electronic storage media" includes all equipment that can store, collect, analyze, create, display, convert, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. This includes any data-processing devices (such as central processing units, memory typewriters, self-contained "laptop" or "notebook" computers, and cellular phones and "smartphones"); ATM machines, internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices,

32

**Exhibit B**

transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); related communication devices (such as routers, modems, cables, and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

80.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on electronic storage media, including cellular telephones.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

81.     I submit that if electronic storage media is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that electronic storage media, for at least the following reasons:

82.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto an electronic storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be

33

**Exhibit B**

stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

83. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space — that is, in space on the storage medium that is not currently being used by an active file — for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

84. Wholly apart from user-generated files, electronic storage media — in particular, computers' internal hard drives — contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task.

85. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

86. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve

34

as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the SUBJECT PREMISES because:

a.    Data on the electronic storage media can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage media that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage media that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.    Forensic evidence on electronic storage media can also indicate who has used or controlled the media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information,

35

**Exhibit B**

configuration files, user profiles, e-mail, e-mail address books, "chat,"
instant messaging logs, photographs, the presence or absence of malware,
and correspondence (and the data associated with the foregoing, such as
file creation and last-accessed dates) may be evidence of who used or
controlled the electronic storage media at a relevant time.

c.    A person with appropriate familiarity with how a computer works
can, after examining this forensic evidence in its proper context, draw
conclusions about how computers were used, the purpose of their use,
who used them, and when.

d.    The process of identifying the exact files, blocks, registry entries,
logs, or other forms of forensic evidence on electronic storage media that
are necessary to draw an accurate conclusion is a dynamic process.
While it is possible to specify in advance the records to be sought,
electronic evidence is not always data that can be merely reviewed by a
review team and passed along to investigators. Whether data stored on a
computer is evidence may depend on other information stored on the
computer and the application of knowledge about how a computer
behaves. Therefore, contextual information necessary to understand
other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a computer was used, the
purpose of its use, who used it, and when, sometimes it is necessary to
establish that a particular thing is not present on a particular electronic

36

storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

87.     I know that when an individual uses a computer to commit the SPECIFIED FEDERAL OFFENSES, the individual's computer will generally serve both as an instrumentality for committing the crime(s), and also as a storage medium for evidence of the crime(s).  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

88.     *Necessity of seizing or copying electronic storage media.*  In most cases, a thorough search of a premises for information that might be stored on electronic storage media requires the seizure of the physical media and later off-site review consistent with the warrant.  In lieu of removing electronic storage media from the premises, it is sometimes possible to make an image copy of the media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and

37

completeness of data recorded on the electronic storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. Searching computer systems is a highly technical process, which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

b. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c. The volume of data stored on many computer systems and storage

38

devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 250 million pages of data, which, if printed out, would result in a stack of paper over ten miles high. Further, a 500 GB drive could contain as many as approximately 250 full run movies or 450,000 songs.

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly

39

**Exhibit B**

unrelated and innocuous file in a process called "steganography." For example, by using steganography, a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or instrumentalities of a crime.

89. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit seizing or imaging electronic storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

90. There is reason to believe that some portion of MAIN AVE. and/or SCRIPTS's business may be legitimate and/or may not involve fraudulent billing of insurers, PBM's and patients. The seizure of the computers at the SUBJECT PREMISES may limit MAIN AVE. and/or SCRIPTS's ability to conduct its legitimate business. As with any search warrant, I expect that this warrant will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized

40

or copied, and what computers or storage media need not be seized or copied. Where appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption. If employees of MAIN AVE. and/or SCRIPTS so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Companies' legitimate business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the Government will return it.

91.      *Necessity of retaining forensic images for purposes of authentication at trial.* In anticipation of litigation relating to the authenticity of data seized pursuant to the Warrant, the Government requests that it be allowed to retain a digital copy of all seized information authorized by the Warrant for as long as is necessary for authentication purposes.

## PREVIOUS APPLICATIONS

74.      On May 27, 2016, the Honorable Leda Dunn Wettre, U.S.M.J., District of New Jersey, signed search warrants in Magistrate Number 16-8860. The search warrant authorized the search of an e-mail accounts used by a physician involved in the compounding scheme to defraud, specifically, benogon2@yahoo.com. On the same day, the United States executed the search warrant at Yahoo!.

41

## **SEALING AND NON-DISCLOSURE ORDER**

75.    This investigation is ongoing.  Premature disclosure of this application and affidavit for Search Warrant may compromise the investigation by, among other things, disclosing the precise matters being reviewed and the status of the investigation to date.  Accordingly, it is respectfully requested that this Application and Affidavit for Search Warrant, as well as all related documents, be sealed until further Order of the Court.

42

**Exhibit B**

## **CONCLUSION**

76.     Based on the foregoing, your affiant submits that there is probable

cause to believe that a search of the SUBJECT PREMISES as described in

Attachment A will reveal evidence, instrumentalities, contraband and/or fruits

of the Specified Federal Offenses at the SUBJECT PREMISES.  Accordingly, I

respectfully request that a warrant be issued authorizing the search of the

SUBJECT PREMISES for records and materials as described in Attachment B,

constituting evidence, fruits, and instrumentalities of the Specified Federal

Offenses as set forth above.


Meghan G. Marino, Special Agent
Department of Defense
Defense Criminal Investigative Service
Office of the Inspector General


Sworn to and subscribed before me this
_____ 6ᵗʰ _____ day of June, 2016.


HONORABLE LEDA DUNN WETTRE
United States Magistrate Judge


43

**Exhibit B**

## ATTACHMENT A

### The SUBJECT PREMISES

The subject premises at issue (hereinafter the "SUBJECT PREMISES"),
including any locked or closed containers located therein, is more particularly
described as 1094A and 1094B Main Avenue Clifton, NJ 07011. The SUBJECT
PREMISES constitute two adjacent suites that operate as a pharmacy, and are
surrounded by various other small town stores located on Main Street. The
SUBJECT PREMISES has a white stucco building, with two green awnings.
The first awning contains the words "PHARMACY" in the center of the awning,
and has the words "MAIN AVE. PHARMACY (973) 928-0208" on both the right
and left sides of the awning. Under the first awning there is a glass door with
the lettering "1094A" directly above the door. The second awning contains the
words: "Bella Fiore FLORAL & WEDDING DESIGNS" in the center of the
awning. The awning also contains a phone number "973-420-6448" on both
the right and left sides of the awning. Under the second awning there is a
glass door with the lettering "1094B" directly above the door. Both 1094A and
1094B contain large windows to the right of their doors, and both windows
have similar vertical shades. Parking at the SUBJECT PREMISES is limited to
street parking. The SUBJECT PREMISES also includes any person located
inside 1094A and 1094B Main Avenue Clifton, NJ 07011.

**Exhibit B**

Photographs A & B



2



Photographs A & B were taken on or about May 23, 2016.

3

Exhibit B

Photograph C



Photograph C was taken on or about June 3, 2016.

Exhibit B

## **ATTACHMENT B**

### **Particular Things to be Seized**

All information described above that constitutes fruits, contraband, evidence and/or instrumentalities of violations of federal law, including Title 18, United States Code, Sections 371 (conspiracy), 1035 (false statements relating to health care matters), 1341 (mail fraud), 1343 (wire fraud), 1347 (health care fraud),1349 (health care fraud conspiracy), and Title 42, United States Code, Section 1320a-7(b) (federal anti-kickback statute) including from in or about January 2014 through the present:

a.      Any and all records, including correspondence, relating to prescription drugs, prescription drug plans, health insurance companies, including TRICARE, Medicare, private insurance, and any pharmacy benefit managers ("PBMs"), including, but not limited to Express Scripts and CVS/Caremark, prescriptions, compounding medications/creams, vitamins, metabolic supplements, marketing companies, web portals, pharmacies,

b.      Correspondence in any form, including but not limited to, e-mail, text messages, letters, notes, text messages concerning compounding pharmacies, physicians or other health care professionals, beneficiaries, including  or marketing, telemarketing, or health care entities, including  Black Cat Consulting, Powell Strategic Advisors, Pharma Sales Group, Troy Pharmacy, Pharma Sales, Medi Biotech, Baltz Marketing, PharmanosticsGroup

5

LLC, Premier Bio-Tech Solutions, SHN Marketing, International Home Plans/ D/B/A SHN; Schaefer, Ian Inc.

     c.    Prescriptions, prescription pads or forms, and prescription medication relating to compounded medication/creams;

     d.    Billing information and payment information related to compounded medication/creams;

     e.    Any and all applications for participation in TRICARE, Medicare, Medicaid and private insurance programs;

     f.    Any and all applications for participation with a PBM;

     g.    Any and all correspondence with PBMs regarding compounded medication/creams;

     h.    Any and all records relating to claims for reimbursement and/or the billing of TRICARE, Medicare, or private insurers for compounded medication/creams;

     i.    Any and all business records of MAIN AVENUE PHARMACY ("MAIN AVE.") and SCRIPTSAMERICA ("SCRIPTS"), including but not limited to correspondence with, and records of payments concerning the scheme, correspondence between members of the scheme, correspondence with pharmacies, teledoctors, other physicians and health care professionals, personnel records, patient files and billing records, written orders or prescriptions, referring provider documentation and patient referral documents, financial statements, Microsoft Excel spreadsheets, and addresses

6

**Exhibit B**

and telephone numbers of business associates, marketing companies, web portals, and other persons and entities;

j.     Any and all documents that constitute, discuss or refer to billing procedures and policies utilized by MAIN AVE. in documenting, preparing and submitting claims to TRICARE, Medicare, Medicaid, or private insurance companies, including, but not limited to: written instructions to employed staff or contracted billing agents, billing manuals, policy statements, training material created for or used by individuals responsible for billing, internal memoranda, bulletins, letters, instructions, handbooks, billing agent contracts, notes or minutes of meetings or notes of telephone calls during which billing issues were raised, and educational or instructional material related to billing which was provided to MAIN AVE./SCRIPTS;

k.     Any and all records, including videotapes, of pharmacists filling prescriptions for customers;

l.     Any and all records relating to diabetic testing strips;

m.     Any and all mailing records, including Federal Express and UPS records;

n.     Any and all contracts, agreements, logs, lists or papers, including records of payments for "commissions";

o.     Records reflecting the location and account information for bank accounts and/or other financial accounts for the user(s) of the accounts and/or their associates;

7

p.      Financial books, records, and documents constituting bank accounts, money market accounts, checking accounts, investment accounts, stock fund accounts, 401K funds, mutual funds, retirement funds, bonds or bond funds, including deposits and disbursements, cancelled checks or draft electronic transfers, ledgers, and credit card/ATM/debit card accounts;

q.      Any and all records which identify the name, address, telephone numbers, e-mail address, tax records and/or social security number of any current or former employees or contractors of MAIN AVE. and/or SCRIPTS, including payroll records;

r.      Records relating to the receipt, transfer, or other disposition of any criminal proceeds;

s.      Records of the creation, use and modification of the accounts or identifiers, including records identifying the user(s) of the accounts, the location from which the accounts were accessed, and the means of access;

t.      Information relating to who created, used, or communicated with the account, including records about their identities and whereabouts;

u.      All healthcare compliance policies, manuals, training materials, and training records.

v.      I request permission to use necessary force to open any locked rooms, cabinets, desks, and containers, including filing cabinets and safes, during the execution of this warrant; and

8

**Exhibit B**

w.     Additionally, I request permission to photograph and create a video recording of the SUBJECT PREMISES.

*Computers and Electronic Media:*

x.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant, including computerized cash register point of sale systems (hereinafter, "COMPUTER"):

i.     evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

ii.     evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.     evidence of the lack of such malicious software;

iv.     evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

v.     evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

vi.     evidence of the times the COMPUTER was used;

vii.     passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

viii.     documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

ix.     records of or information about Internet Protocol addresses used by the COMPUTER;

x.     records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered

9

into any Internet search engine, and records of user-typed web addresses;

      xi.     contextual information necessary to understand the evidence described in this attachment.

    s.    In order to search for the items described above that may be maintained in electronic media, law enforcement personnel are authorized to search, copy, image and seize the following items for off-site review:

      i.     any computer or storage medium capable of being used to commit, further or store evidence of the Specified Federal Offenses; and

      ii.     any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer or storage medium;

      iii.     Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile/cellular phones, tablets, server computers, computerized cash register point of sale systems, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

    t.  For purposes of authentication at trial, I request that the Government

is authorized to retain a digital copy of all seized information

10

**Exhibit B**

authorized by the Warrant for as long as is necessary for
authentication purposes.

As such, I respectfully request issuance of a search warrant for business
records and documents, in whatever form they are kept, including electronic
storage media and cellular telephones, and items, as described more
specifically in Attachment A, which constitutes evidence and instrumentalities
of violations of the SPECIFIED FEDERAL OFFENSES.

11

Exhibit B